The statute in this case is clear and unambiguous. When a school district evaluates a student for special education eligibility, it is required to assess in all areas of suspected disability. Now, despite the district's claim in the opposition brief that it had no reason to do so, at the time it conducted its initial assessment, the district expressly conceded below that, and I quote, the district was aware that the regional center suspected Ello was autistic before it conducted its own assessment. That concession disposes of the district's primary argument in this appeal brief. Now, the statute also provides for specific requirements on what must be in the assessment, how it should be conducted. It has to use a variety of assessment tools and strategies. It must not use any single measure or assessment as the sole criteria. Technically sound instruments must be used that are valid for the purpose, and they have to be administered by a trained and knowledgeable personnel. Now here, I don't think, counsel, that it can be disputed that there was some suspicion that at a minimum, based on the Griffin assessment alone, that there were issues with regard to the child possibly falling within the autism spectrum. Part of the district court's analysis relied on the fact that Mr. Peck, Dr. Peck, actually did participate in the school district's assessment and came to observe, I think it was a 40, 45-minute observation. What do you make of the district court's assessment that this, or analysis, that this was part of the assessment? The evidence below, Your Honor, and the testament is very clear that it was not part of the assessment. The assessment plan did not list Mr. Peck as being an assessor, and he testified at the hearing because I specifically raised an objection to his testimony that sounded like he was presenting an assessment. And he was examined by the hearing officer, and he said, no, this was not an assessment. This was a casual observation for me to determine whether an assessment really was necessary. So this was sort of a second layer, where he was second-guessing the suspicion of autism. And what happened is he went in, and the child didn't look autistic to him, so they decided they wouldn't assess. And he wasn't certified to conduct the assessment, is that right? He, well, he was not trained in the ADOS, which is an observational assessment, but it's also interactive. He clearly did not administer the ADOS, and he did not have the training to do it. But again, he wasn't even assessing, and he doesn't claim to have been assessing. This was a routine procedure that the school district did when there was a suspicion of autism. Instead of assessing, they simply sent the school psychologist in to take a look. And if he didn't see what he thought were obvious characteristics of autism, they wouldn't assess. There's nothing in the statute that permits this to happen. If there's a suspicion, there has to be an assessment, and it has to be done the way the statute says it needs to be done. None of that was done here, nor would it have been very difficult to do so. When you're assessing a three-year-old who is nonverbal and uncooperative, the assessment really consists of giving questionnaires to the parents and to the service providers. Those questionnaires are designed to elicit the appropriate information, the necessary information relevant to the standards for eligibility. This was not done. Nobody made an effort to ask the parents in a systematic way consistent with what the statute requires, what were the characteristics, what was happening with the child. It would not have been expensive, it wouldn't have been particularly time-consuming, and it's very difficult to understand why the district simply wouldn't have done it. The cost of not doing it is quite substantial. As this court has recognized in Amanda J., early intensive intervention is extremely important for children with autism. The outcome can be very different if the child gets the intervention. Three to five is considered to be the most significant window of opportunity. Educate me a little bit, Ms. Tiffany, with regard to this issue. Let's assume that there was a procedural violation because there was a failure to conduct the assessment despite the fact that there are suspicions, particularly coming from the Griffin assessment. But Dr. Griffin did not diagnose autism. It's a disorder somewhere on the scale of autism. It's not the district itself, and so that rendered the child, if I recall correctly, the record ineligible for regional center services. So let's say that the district had conducted the assessment, but it came back the same as what Dr. Griffin determined, which is that there's no autism. There are certainly symptoms falling along the autism scale. Is the record clear that the goals would have been written differently? Your Honor, the eligibility criteria are different. In regional center, they required what is called full-blown autism, which today would be severe autism under the new standards that they're using for the DSM. At that time, when a child was on the autism spectrum but didn't have what they called full-blown autism, they would get an alternative diagnosis like PDD-NOS, as was the case here, or possibly Asperger's. Those terms aren't used anymore, but they were at that time. For educational eligibility, the standards are very different, and in the appendix to the brief, we show an example of the DSM standards at the time, which were substantially more stringent than the educational standards. Very commonly, children who have PDD-NOS, who have Asperger's, who are on the spectrum, are eligible for special education services as autistic because the standard is very different. It's intended to be. It's intended to be substantially broader so that it does not exclude children who are exhibiting characteristics of autism. We believe, and in fact, our expert testimony was, and frankly, if you just read the assessment that Dr. Griffin conducted and performed, she found two of those elements that are necessary, and only two are necessary to be eligible as autistic in the education code, a severe language delay and severe social skills delay. Those were more than substantial at that time to warrant eligibility for autism, and yet the school district didn't even bother to assess. So there would be behavioral services offered through the IEP, for example, that would have been written in? It's quite possible that there would have been, and certainly the parents would have been in a position to request those services and to contest the appropriateness of what was offered. The whole concept of having these procedures, and this court has held that the procedures are vital. They're equally as vital as the substantive IEP, and the reason is that when you do this educational benefit in the IEP, and the district spends a good deal of the argument trying to argue that, well, the child did get educational benefit anyway, that is not an appropriate inquiry unless you have established that you have complied with the procedural violations, because it presupposes that that test of some educational benefit presupposes compliance with the procedural requirements. If the procedural requirements haven't been followed, or I'm sorry, if they have been followed, then yes, give deference to the school district, respect their views, if the child's made some educational benefit, then that's appropriate. But if they haven't been followed, then the parents and even the school district employees, the staff, are not in a position to make a fully informed decision about what the child's educational needs are, and this court has repeatedly reaffirmed that view. So if there's a procedural violation that impairs the ability of the parents to meaningfully participate in the IEP formulation process, and clearly, again, the court has held that where there's an autism suspicion and there's no assessment, where the assessment hasn't been given to the parents, then that is not full participation in the IEP process. Now, turning to the behavior issue, this really underscores the importance of knowing the nature of the disability, not just what the district has referred to as areas of need. The district did not know why this child wouldn't talk. They just didn't know. Ms. Castro, who was a speech therapist, flipped through the DSM and came across this concept of selective mutism, and so she thought, well, maybe that's it. Now, she testified that had she known that he had a PDD-NOS diagnosis and therefore was on the autism spectrum, had there been anything in this IEP that had even mentioned that, she did not see the Griffin assessment. She was the second year, so the assessment apparently wasn't in his records or wasn't provided to her. She had no idea. And she testified she never would have suggested this in the first place because it's clearly inconsistent. As the DSM specifically says, it is inconsistent and is not appropriate for a child with autism. The way they decided to address him, given that it was selective mutism, was to try to make him feel more comfortable, accommodate his refusal to speak, give him little icons that he could use instead of talking, don't ask him to come up to the front of the classroom because he didn't like to do that. Well, the goal of that was to make him feel comfortable and relaxed, and the idea was eventually he'll just start talking because of his comfort level. That was exactly the wrong thing to do if the refusal to speak was due to autism, as it was here. Our expert testified that with an autistic child who won't speak, that simply reinforced it, its behavior. It reinforced it. It made it more likely to continue rather than to dissipate. And when we finally did get him the appropriate program during the summer, in fact, he began to speak after a very short amount of time when the appropriate therapies were provided. So without knowing the autism, you can't really design an appropriate program. I don't know if this was in the record. Is he still part of the school district, or did parents pull him out? Your Honor, the parents felt so uncomfortable after this hearing that they decided they could not send him back to that school district. They enrolled him in a charter school, and he has been enrolled there for a few years. Frankly, that placement is not working out either. This child desperately needs the services that we wanted to get him to begin with, the ABA therapy and an effective speech program, and he's not getting either right now. Okay. Reserve whatever time. You can reserve the rest of your time for rebuttal. Yes. Thank you. Thank you. Counsel, before you start, I should have asked you this question at the outset of the proceedings. I didn't realize until this morning that Ms. Tiffany was arguing the case. As you know, she's married to a colleague of mine, and I consider somebody I know fairly well. The reason I didn't know is because I really don't pay any attention to who the lawyer is when I prepare for a case. However, I want to give you the opportunity. If you prefer that I not hear this case, you should say so, and then another judge will take my place. Your Honor, first I'll say my name for the record, Diane Beal, representing Paso Robles Joint Unified School District. I was aware of potential relationships. Unless Your Honor believes that that raises a conflict of interest for you and that you can't evaluate the case fairly, then I would. I'm sorry. I can't hear you. I'm sorry. I said I was aware of the potential of the relationships because of Ms. Tiffany's spousal relationship. My question for Your Honor is whether or not you feel there's a conflict of interest that would impact your ability to render a fair decision in this matter. I assume you would recuse yourself if you felt that. Yes, I would if I felt it would affect my judgment, but I wanted to give you the opportunity that if you felt, aside from that, there was any reason that I should not hear it, knowing that I know Ms. Tiffany rather well, and if I tell you that it would not affect my judgment, I want to still give you the opportunity if you think I should not because of any appearance. No, Your Honor. I'm prepared to move forward, and I appreciate your candor. Thank you, counsel. It's difficult to know where to start, so I would like to begin by referencing a little bit of the procedural history so I can put this case in context with respect to the disputed issue that counsel raised. I was not the attorney who handled this case at the hearing level. Ms. Tiffany was. My prior colleague, Shauna Cunningham, handled the case. She also wrote the briefing below before the district court. I did argue that case, but I did not prepare any of the pleadings. I am going to, following your own candor, Your Honor, I'm going to be very honest and say that when I reviewed parts of the record below in the briefing and argued the case before the district court, I realized that a fact which should have been disputed was not disputed, and that is this issue of whether or not the district knew that the regional center suspected that L.O. was autistic. Quite frankly, the facts in the record don't support not disputing that fact. That is just the honest matter, and I did read the entire transcript when I prepared the pleadings in this case in the briefing, and I did set forth facts in our brief which explain that the school district really did not have a suspicion that L.O. was autistic at the time they conducted their initial assessment, nor is there any reference in this record. I thought they got a copy of the Griffin assessment. Yeah, so I would like to really use my time to explain some of that. Actually, counsel, if I can give you a piece of advice. If you pull both microphones a little closer to you, you don't need to lean or speak right into it. They're quite sensitive, and they'll be able to pick you up nice and loud. On the issue of the Griffin report, the difficulty with the Griffin report is that Dr. Griffin conducted her assessment on behalf of the regional center to see if the student was going to qualify for continued services. She conducted it on November 18th of 2009. She wrote a report thereafter. That report came to the school district on approximately December 2nd. There is not any possibility factually that the school district team, including Mr. Peck, would have been aware of Dr. Griffin's report, her testing, her observations, or any of her conclusions at the time they conducted their own initial assessment. That is the confusing matter in this case. It's simply not possible. Throughout the hearing transcript, the administrative law judge kept trying to establish that fact when she asked questions, because she was highly involved in asking questions during this hearing process. Finally, in the record, Mr. Peck did finally say, when he observed the district's log, that it did refresh his recollection that he did not have that report until December 2nd. When you look at this issue of what the district knew and didn't know at the time they conducted the assessment, Ms. Tiffany based that undisputed fact on two pieces from the record, two distinct pieces that I think are extremely important for this court to look at. One was ER 382, which was the transcript at 691. When you look at the transcript, the administrative law judge asked Mr. Peck, what was the purpose of your observation? He answered, just basically to consult with the staff in terms of possible handicapping conditions which may be, and then he said may have or may not have been present. Was this a standard practice of the district for you, asked the administrative law judge. Yes. Then she asked, can you give me some ideas to what percentage of these kinds of assessments? And then he said, Mr. Peck said, of all the little peppers assessments, that was the preschool assessment process, I'd say approximately about 25%. She asked then, the administrative law judge, and what would be the reason that would impel you to do this? The witnesses answered, I think what triggered my involvement was the report from Dr. Griffin, in a sense that there was a possibility of looking at autism as a handicapping condition. I usually get called into the observations if there might be the presence of a handicapping condition other than speech and language. The administrative law judge asked, but the evidence is established well. There's a document that indicates that it was not received until December 2nd. Then Mr. Peck said, yeah, I think that what happens with the little peppers process is we are kind of aware of a report and the preliminary results of the Tri-Counties case carrier. And then he said, and I'm not sure if that was the case or not. I think the likelihood of that being the case is pretty high. But again, he said, I'm not sure if that was the case. Well, we know it couldn't have been the case, because she hadn't even done the assessment yet. Can I ask you a couple of questions about all this? And they're all maybe intermingled, but one question, and just keep it in mind until I get through, is what do you do if a proceeding has gone forward on the basis of stipulated facts and the district court has ruled on that basis and on appeal there's a challenge to the facts? Have you waived any basis for challenging those facts? Or can we go back to the very beginning and say this case shouldn't have been tried on the basis of those facts? Are you free to challenge at this point the fact that the facts are not as they were stipulated to? Wait until I finish all the questions. Secondly, does it matter when the suspicion came? Whether it came on December 2nd, did you have a duty at that point to make an assessment? Or does that Dr. Griffin's report not raise any kind of a duty on your part to make an assessment? Thirdly, I think it was the ALJ who said that Dr. Griffin's assessment was discussed thoroughly at the December 4th meeting, although the record seems to be to the contrary, but at least the school district knew as of that date of the assessment. That's the end of my questions. I'm trying to go back and remember them. I was listening more carefully than I was writing them down. On your first question, in looking at the law and the standard of review, I believe that this court, because you reviewed de novo, and because you can evaluate witness testimony and evidence independently, that you can go back and look at the facts in the record to see whether or not they support the undisputed fact put forward by the plaintiff that the district had information from the regional center. At the time of the initial assessment. Put forward by the plaintiff, but stipulated by the defense. I mean, that's the question. All right, so my answer is that I believe that because this court reviews de novo, you can go back and reevaluate that testimony again, and that the issue should not be waived on appeal because we are reviewing the issue de novo, and all the briefing is written from the standpoint that this court is reviewing de novo. In addition, I know that in her reply brief, Ms. Tiffany did cite the case of U.S. V. Hinkson at 585 F. 3rd 1247 from this court, which stated that you would affirm a district court's factual finding unless it was illogical, implausible, or without supporting inferences that may be drawn from the record. It would be my position that with a de novo review, you could look at that one fact to see whether it was an inference that could be drawn from the record. I have gone through the record painstakingly. I have several different slides that I could give to you to demonstrate that that fact was not proven. I do not think it changed the district court's analysis, however. I think it only bolsters it. I think it only lends additional weight to the district court's finding because the district court assumed that that was an undisputed fact and went on to say that that suspicion was dispelled when Mr. Peck came in and did his observation during the initial assessment on October 30th of 2009. So if you haven't even established that prong of even having the reasonable suspicion, that would only bolster, in my view, the district court's finding. The second question, I believe, is what do you do when the district receives the report? Is that correct? Is that your question? What do you do? Does that create the suspicion that requires you then to make an assessment? I submit that it does not. The reason why is that I believe you really have to look at all of these facts in their totality because this is such a fact-driven case. It's a fact-driven case, and particularly around the issue of whether there was suspicion regarding autism as a disability. Mr. Peck, and if I could note just briefly, we're not talking about a casual observer. Yes, he was doing an observation, which was allowed under the assessment plan, but he was a school psychologist with 31 years of experience who had assessed many autistic children himself, even though he was not a doctor. And he looked at a number of pieces of other material, other data, other reports regarding this student. He came in. He observed him for 30 to 40 minutes. He did not observe what he believed to be two characteristics of being autistic-like under the then five California Code of Regulations 3030G. And he specifically spelled that out in his testimony, which the judge gave great weight to because he went into great detail about what he saw with the student socially. Now, when he received Dr. Griffin's report, which we know from the facts, I mean, that she didn't even conduct that assessment until well after he was done with his, she found that, well, number one, she made a provisional diagnosis. It was provisional. It was a wait-and-see. They were in a watch mode. And she also administered the CARS, the Child Autism Rating Scale. And she found on that CARS that the student scored in the non-autistic range. And Mr. Peck testified that the CARS scoring and her finding it with the CARS was consistent with what he observed during the observation of the student. She talked in her report. When Dr. Griffin made his report, and Dr. Peck said that's consistent, you're saying that even that report didn't raise his suspicion? Right. There is testimony from Mr. Peck where he goes through and he explains why that report did not cause him to think that Luke Olson, L-O, I'm sorry, L-O, or the student, why he didn't believe that that caused him to qualify for special education under the autistic-like criteria. And again, she's doing a medical assessment. Does the report raise any suspicion? No, because she found that he was not autistic. She found that he had a provisional diagnosis of PDD, NOS, pervasive developmental delay, not otherwise specified. That's not enough for suspicion to test him? At that point in time, there really wasn't much. There's discussion about testing, but we have to talk about what does testing of a three-year-old look like at that time period. Ms. Tiffany and I do agree with her. You're talking about giving rating scales. Dr. Griffin had given a rating scale and he scored in the non-autistic range. That dispels a suspicion of autism. It doesn't create one. Well, it sounds to me like that argument is more of a, we relied on Dr. Griffin's testimony, so let me ask you this. If we disagree with you and find that there was, in fact, a procedural violation, does the district court then lose? And if no, why not? Well, of course, Your Honor, I would respectfully disagree that there's a procedural violation. However, no. I still believe that you can follow this court's, the district you can follow and give due weight to the district court's analysis regarding harmless error. Because, as we pointed out in our briefs, and there have been cases around this issue, and it is also spelled out in the IDEA that a student is not entitled to an eligibility classification. They're entitled to a free, appropriate public education. Right, that's what I'm getting to, whether the procedure violations result in the denial of a free and appropriate public education. How can the district win, given the evidence in the record, including the therapist indicating that she would have recommended a different course of services, I guess. Because all the witnesses, so Mr. Peck and Ms. Stinson, the district witnesses, both testified that with all of the information that they had, their own assessment and Dr. Griffin's assessment, that they would have made the same offer of faith, they would have identified the same areas of need, and they would have prepared the same goals, whether or not they had classified the student as eligible for special education under the category of autistic-like, or whether they would have classified the student as eligible under speech and language impairment. Because at the end of the day, their obligation under the IDEA... I thought the speech therapist said that she would have referred behavioral services if she knew that the silence was due to autism-type disorders. Yes, Your Honor, that actually is not correct, and I think it gets confusing because in education law, and in this case, we look at school years. So, because I'm running short on time, I better make my points quickly. So first, we have to look at the 2009-2010 school year. The psychologist, or I'm sorry, the speech and language therapist that Tiffany is referring to, that occurred the following year. So the first thing we have to do is analyze whether the student received a FAPE during the first IEP, the 2009-2010 school year, which he was coming in in December, so there was half of a school year, essentially. So on that point, the district witnesses testified they would have developed the same IEP for the student regardless of the eligibility category. The IDEA has made it clear that what matters is not eligibility category, nor is the student entitled to a specific eligibility category. There had been discussion with the parents regarding the programs that were available. They were both special education related. There was the PEPPERS program and the PAWS program. Both were taught by special education teachers. Both had autistic children in the classroom. Both had some evidence-based practices infused into them. They were both embedded with speech and language. They both had speech and language therapists working in the classroom. There was clear testimony that the parents wanted a parent participation preschool because they did not want to drop their child off and they wanted to be able to participate. The IEP was specifically written offering the parent education preschool program with the caveat that the staff were going to monitor the student in that program and come back to the table if the student needed more intensive programming. So that program afforded the student a free appropriate public education. It focused on communication and social skills and learning to learn skills, all of which are necessary for children on the autism spectrum. There was testimony that autistic children were in that program and they benefited from it. The IEP that they developed identified all the student's areas of need. We pointed out that the student made progress on his goals in the half of the year that he was in the program. And also the district very quickly got back to the parents in February and started having a dialogue with parents about moving the student into the PAWS program so that he could receive more intensive services. Parents chose not to do that at that time and instead wanted to wait until the following school year. The administrative law judge made specific findings, factual findings that the student benefited from that program irregardless of his eligibility category. She also pointed out that the student's expert criticized the program but never saw it, in fact, never ever even observed the child in school. Now with respect to Ms. Tiffany's comment about... You're going to have to wind it up with a last sentence or two because we're way over. I want to make a couple of comments about this claim of denial of FAPE in the second school year. There are some important points that this court needs to keep in mind. One, the parents did not return the child to school until November of the 2010-2011 school year. So when he came, he missed part of August, September, October, and he came in in November. So he's coming into the classroom, he's been out of school for months because parents have kept him out of school. And so now the staff is trying to reintegrate him back into the classroom. And they're observing him, they're adapting as they go from day to day. There's a speech and language therapist working with him. He's receiving speech and language therapy pursuant to his IEP. And an IEP was held in December of that year to discuss working with the student around his speech. And then in February of 2011, the district sent an assessment plan to the parents, which included a behavioral assessment. And the parents did not return that assessment plan until May. And so the parents, by not signing the assessment plan, precluded the district from going back in and conducting further assessment. Which, by the way, Dr. Griffin said, that was around the time frame when Dr. Griffin had recommended that the student be reassessed anyway in preparation for kindergarten. So I submit to you that the record bears out that there was not a procedural violation. But if this court did find that there was, that the student still substantively received a free and appropriate public education, that there was not a denial under the IDEA. Thank you, Kathy. Thank you. Thank you both very much. The case just argued will be submitted and the court will stand in recess for the day.
judges: Reinhardt, Noonan, Nguyen